UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Erick Peeples, *et al.*,

      Plaintiffs,

v.                                                    Civil Action No. 13-13858

City of Detroit, *et al.*,                            Sean F. Cox
                                                      United States District Court Judge
      Defendants.

_____/

## OPINION & ORDER

Plaintiffs are eleven firefighters who were laid off by the City of Detroit during a reduction in force. Plaintiffs were recalled to work 80 days after being laid off and the Union successfully grieved their layoffs, securing a settlement under which the City agreed to a "make-whole" award of backpay for each Plaintiff. In this action, Plaintiffs assert a Title VII race discrimination claim against the City, and against their Union. Discovery closed and all discovery disputes have been resolved.

The matter is before the Court on motions for summary judgment brought by the City and the Union. The motions have been fully briefed and none of the parties requested to file supplemental briefs, or to submit any additional evidence, after the parties resolved their discovery disputes.[1]

The Court finds that oral argument would not aid the decisional process. *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. The Court therefore orders that the

_____

[1]The Court notes that Plaintiff did file a Notice of Supplemental Authority on January 25, 2017. (D.E. No. 90).

1

motions will be decided upon the briefs.

For the reasons set forth below, the Court shall GRANT the motions for summary judgment filed by Defendants, but shall DENY their requests for sanctions.

As to the City's Motion, the Court concludes that the only Plaintiff who has exhausted his administrative remedies such that he can pursue a Title VII claim against the City in this action is Rivera. Nevertheless, the Court shall address the City's remaining challenges as to all Plaintiffs. The Court concludes that Plaintiffs have failed to present direct evidence to support their claims. The Court also concludes that Plaintiffs' have failed to establish a prima facie case, under the circumstantial evidence approach, which includes a heightened burden in this reduction-in-force case.

As to the Union's Motion, it shall be granted because Plaintiffs cannot establish that the Union breached its duty of fair representation to Plaintiffs, which Plaintiffs must do in order to proceed with a Title VII claim against a union in the Sixth Circuit. The Union's motion shall also be granted because Plaintiffs have been reinstated and made whole, and other types of damages claimed by Plaintiffs are unavailable as to the Union.

## BACKGROUND

Plaintiffs filed this action on September 10, 2013. On October 29, 2013, this Court issued an "Order Of Removal Of Action As A Pending Matter" (D.E. No. 4) because of the bankruptcy stay pertaining to the City of Detroit.

On August 13, 2014, the City of Detroit filed a notice indicating that the bankruptcy stay had been lifted. (D.E. No. 8).

**Plaintiffs' First Amended Complaint**

On May 11, 2015, Plaintiffs filed a one-count First Amended Complaint, which is the operative complaint.  (D.E. No. 12).

There are eleven individual Plaintiffs in this action: 1) Erick Peeples; 2) Perry Anderson; 3) Vincent Fields; 4) Arnold Freeman; 5) Ralph Glenn, Jr.; 6) Jamal Jennings; 7) Lee Jones; 8) Anthony McCloud; 9) Exander Poe; 10) David Rivera; and 11) Samuel Shack.  Rivera is Hispanic and the remaining Plaintiffs are black.

Each Plaintiff asserts a Title VII disparate-treatment race discrimination claim against Defendants City of Detroit ("the City") and Detroit Fire Fighters Association, Local 344, IAFF, AFL-CIO ("the Union" or "DFFA").

Plaintiffs allege that the applicable CBA provides that layoffs shall be done in accordance with "Human Resources Department Rules XI and XIV which were in effect on July 1, 1977 . . ."  (First Am. Compl. at ¶ 12).

Plaintiffs alleges that those rules define seniority to mean "total city seniority" and that employees are to be laid off "in the inverse order of total city seniority."  The City denies those allegations as untrue.  (First Am. Compl. and City's Answer at ¶ 13 & 14).

Plaintiffs allege that after the City announced that layoffs would take place in the City of Detroit's Fire Department, the City sent out one or more lists of the employees to be laid off, which was according to total City seniority, and that Plaintiffs were not on the lists.  (First Am. Compl. at ¶ 22).

Plaintiffs allege that the Union objected to those layoffs, and "sent a letter to the City setting forth its objections, falsely claiming that the proposed lay-offs violated" the CBA.

(First Am. Compl. at ¶ 23).  They allege that the City and the Union held a meeting about the layoffs and that, after that meeting, the City "rescinded the original lay-off list and replaced it with a lay-off list that reduced several Black or Hispanic firefighters," including Plaintiffs, "who had more City seniority than Caucasian firefighters" who were not on that list.  (First Am. Compl. at ¶ 25).

The First Amended Complaint indicates that each of the Plaintiffs were recalled to work as firefighters on October 29, 2012.  (First Am. Compl. at ¶¶ ).  It states that, with the exception of one Plaintiff who took work as a firefighter elsewhere (Anderson), each of the Plaintiffs was reinstated, and grieved their layoff and had some backpay paid to them as part of the settlement of their grievance (Peeples, ¶ 33; Fields ¶ 73; Freeman ¶ 93; Glenn ¶ 113; Jennings ¶ 133; Jones ¶ 153; McCloud ¶ 173; Poe ¶ 193; Rivera ¶ 213; and Shack ¶ 233).

Plaintiffs seek the following relief: 1) back pay and benefits lost due to the layoff; 2) compensatory damages; 3) punitive damages; and 4) attorney fees, and interest.  (First Am. Compl., D.E. No. 12, at Pg ID 81).

**The Scheduling Order And Discovery Disputes**

On March 1, 2016, this Court issued the Scheduling Order in this matter.  The Court ordered, among other things, that discovery was to close on April 29, 2016.

The parties filed several discovery motions, which this Court referred to the magistrate judge assigned to this case, beginning on January 28, 2016.

On April 18, 2016, Counsel for the Union sent Plaintiffs' Counsel a letter asking Plaintiffs to dismiss the claims in this action against the Union.  (D.E. No. 58-51).  That letter set forth the Union's position as to why Plaintiffs cannot prevail in this action.  Among other things,

the Union's letter addressed damages, including the argument that Plaintiffs had been made whole in terms of backpay, and arguments as to why Plaintiffs cannot recover other types of damages they seek in this action.

### The City Filed A Motion For Summary Judgment Following The Close Of Discovery, Although Discovery Motions Were Still Pending Before The Magistrate Judge, But Thereafter This Court Resolved All Discovery Disputes.

Following the close of discovery, the City filed a Motion for Summary Judgment (D.E. No. 54) and the Union filed its own Motion for Summary Judgment.  (D.E. No. 56).

After a hearing had been scheduled on the motions, and this Court began reviewing them, this Court realized that there were discovery motions still pending before the magistrate judge. This Court then issued an order adjourning the summary judgment hearing, pending rulings on the discovery motions before the magistrate judge.  (*See* 9/28/16 Text-Only Notice).

Thereafter, counsel for the parties requested that the Court hold a Status Conference to discuss the outstanding discovery motions, a September 22, 2016 order the magistrate judge had issued (that did not address the merits of the motion), and objections to same.  At a October 11, 2016 Status Conference, this Court explored all of the outstanding discovery issues with the parties and they resolved all of their disputes.  Thus, this Court issued an order on October 16, 2016, withdrawing the reference to the discovery motions filed as Docket Entry Numbers 43, 52, and 53, and set aside the magistrate judge's September 22, 2016 order.  (D.E. No. 86).

As discussed and agreed at the October 11, 2016 Status Conference, the Court rescheduled the summary judgment hearing for January 26, 2017, and the parties submitted a Stipulated Order wherein (D.E. No. 89) they stated that they had resolved all issues pertaining to the discovery motions.

**The Relevant Facts Set Forth In The Parties' Briefs**

This Court's practice guidelines, which are expressly included in the Scheduling Order

issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute.  The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled
> Counter-Statement of Disputed Facts.  The counter-statement shall list in
> separately numbered paragraphs following the order or the movant's statement,
> whether each of the facts asserted by the moving party is admitted or denied and
> shall also be supported by appropriate citations to the record.  The Counter-
> Statement shall also include, in a separate section, a list of each issue of material
> fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute
> shall be deemed admitted unless controverted in the Counter-Statement of
> Disputed Facts.

(D.E. No. 38 at 2-3).

In compliance with this Court's guidelines, in support of its Motions for Summary

Judgment, the City filed a "Statement of Material Facts Not In Dispute" (D.E. No. 55) ("the

City's  Stmt.").  In response to that submission, Plaintiffs filed a "Counter-Statement of Disputed

Facts" (D.E. No. 70) ("Pl.'s Stmt. C").

In support of its Motion for Summary Judgment, the Union filed a "Statement of Material

Facts Not In Dispute" (D.E. No. 57) ("the Union's  Stmt.").  In response to that submission,

Plaintiffs filed a "Counter-Statement of Disputed Facts" (D.E. No. 71) ("Pl.'s Stmt. U").

Plaintiffs' Counsel filed statements responding to both of the above statements by

Defendants.  However, Plaintiffs' Counsel certainly did not comply with either the letter or the

6

spirit of the Court's guidelines, which are intended to narrow the facts that are truly in dispute. Throughout Plaintiffs' statements, Counsel includes, and continues to restate, unnecessary objections. Plaintiffs' Counsel also denies various factual statements, even though Plaintiffs' response indicates the statement is true. (*See, e.g.*, Paragraph 4 of the Union's Stmt. and Pls.' Response to same; Paragraph 11 of the Union's Stmt. and Pls.' Response to same).

In any event, the relevant facts, established by the record evidence submitted by the parties, are as follows.

The Union, DFFA, is the certified collective bargaining agent for the uniformed firefighters of the City of Detroit Fire Department. (First Am. Compl., and City's Answer to same, at ¶ 5). At all pertinent times, the City and the Union were parties to a collective bargaining agreement (CBA). (Union's Stmt. and Pls.' Stmt. U at ¶ 3).

Plaintiffs are eleven City firefighters and Union members that were affected by an August 2012 reduction in force. (Union's Stmt. and Pls.' Stmt. U at ¶ 4). Rivera is Hispanic and the remaining ten Plaintiffs are black. (Union's Stmt. and Pls.' Stmt. U at ¶ 5 & 6).

On June 20, 2012, the City notified the Union of an impending reduction in force. (City's Stmt. & Pls.' Stmt. C at ¶ 2). This was the first RIF in the Detroit Fire Department ("DFD") since 2005. (Union's Stmt. and Pls.' Stmt. U at ¶ 11).

On June 20, 2012, the City sent the Union a letter that stated, in pertinent part:

> In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than July 20, 2012. Layoff notices shall be issued in accordance with your Collective Bargaining Agreement.

(Ex. 3 to City's Br.).

7

In a letter dated June 29, 2012, the City notified the Union that City of Detroit Fire Department "is reducing the number of DFFA positions by two-hundred and eighty-seven (287)" and that "these reductions will result in actual layoffs of 164 positions." (Ex. 4 to City's Br.). An August 2, 2012 Official Bulletin from the Office of the Fire Commissioner, however, advised that "[d]ue to retirements and demotions of personnel in the Fire Fighting Division, the number of layoffs has dropped" to "28 lay offs." (Ex. 5 to City's Br.).

The City announced that it would use City-Seniority, i.e., total City years of service regardless of City departments, to determine the DFD layoff order. (Union's Stmt. and Pls.' Stmt. U at ¶ 13).

On July 30, 2012, the City gave the DFFA a RIF "matrix" or listing to show the intended RIF employment actions, including demotions, transfers, and layoffs. (Union's Ex. 11). That matrix listed 29 firefighters who would be laid off, but did not include Plaintiffs as layoff candidates. (*Id.*; Union's Stmt. and Pls.' Stmt. U at ¶ 16). The matrix submitted to the Court does not identify the races/nationalities of those who would be laid off, demoted, or transferred.

Thereafter, in a letter sent on July 30, 2012, the DFFA urged the City to use Department-Seniority, ie., seniority only within the DFD, to determine layoff order. (Union's Ex. 12; (Union's Stmt. and Pls.' Stmt. U at ¶ 18). That letter stated that the lists created by the City violate the CBA by not using Department Seniority. The letter included DFFA-created lists that applied Departmental-Seniority, rather than City-Seniority, to the City-forcasted employment actions. Those lists included Plaintiffs as candidates for layoffs. (*Id.*).

On July 31, 2012, the DFFA filed a "Class Action Grievance #17-12, Violation of Reduction in Force" (Union's Ex. 14). That grievance vaguely asserted that the City was

8

violating the CBA in how it was laying employees off and asked the City to cease and desist from violating the CBA and "restore all members affected by illegal layoffs and demotions." (*Id.*). That grievance was "filed before anyone was actually laid off." (Pls.' Stmt. U at ¶ 22).

On August 2, 2012, the Union sued in Wayne County Circuit Court to enjoin the closing of fire houses. (Pls.' Stmt. U at ¶ 24). At around that same time, the City and the Union met again to review the projected RIF. (Pls.' Stmt. U at ¶ U 25).

On August 10, 2012, the City laid off Plaintiffs and 16 other firefighters, a total of 27 layoffs. (Pls.' Stmt. U at ¶ 28; Union's Exhibit 18). The layoff notices to those laid off indicated the reason for the layoff was lack of funds. (*Id.*). The layoff notices do not identify the races/nationalities of those laid off.

Thereafter, on August 14, 2016, the Union wrote a letter to each firefighter who was laid off, including Plaintiffs, stating that the Union was doing everything it could do to hasten their return. (Pls.' Stmt. U at ¶ 33; Union's Ex. 24).

In August and September of 2012, Plaintiffs and Union officers met several times. (Pls.' Stmt. U at ¶ 35). In those meetings, some Plaintiffs' challenged the Union's reliance on department-seniority and indicated they wished to file grievances regarding their layoffs. (*Id;* Union's Exs. 25 & 26). Plaintiffs and Union officers discussed the issue of how the layoffs were supposed to be made under the CBA and rules. Union officers stated that they were working on getting answers to the issue. (*Id.*).

There were disagreements between Union executive board members with respect to the applicable seniority rules and the Union ultimately sought legal advice from counsel on the issue. (Union's Stmt. at ¶ 52-53)

On September 18, 2012, the Union's attorney sent the Union a non-confidential opinion letter regarding seniority ('the Seniority Opinion Letter"), wherein counsel stated "we believe that 'total City seniority' is the contractually-required metric for determining the order of layoffs and demotions attributable to a reduction in force, and no 'past practice' Invalidates this clear procedure." (Union's Stmt. at ¶ 58; Union's Ex. 33)

The Union claims that it gave the Seniority Opinion Letter to Plaintiffs immediately after receiving it. (Union's Stmt. at 62). Plaintiffs assert that it is unclear whether all Plaintiffs received the letter, and claim it is unclear as to the timing of when the letter was distributed to Plaintiffs. (Pls.' Stmt. U at 62).

Plaintiff Shack testified that the Union told him and other Plaintiffs that they had checked and been told that the Plaintiff's position about seniority was right, and that they would work to fix the problem, around September 18, 2012, the day the Seniority Opinion Letter was received by the Union. (Shack Dep. at 171).

In any event, the Union advised its membership of its changed position within days of having received the Seniority Opinion Letter. The meeting minutes for the Union's September 24th and 25th regular general membership meetings reflect that:

> DEMOTIONS/LAYOFFS: President McNamara explained how and why demotions and layoffs were decided and implemented by the city. He further explained how the DFFA, without the contractually obligated lists that were to be provided, wrote a letter stating that layoffs were to be decided by departmental seniority.
>
> He went on to state this is incorrect and total city seniority is to be used in determining layoffs and apologized to the membership. The DFFA will argue that fact in grievance #17-12.
>
> President McNamara further reports the DFFA requested/received a legal opinion regarding the interpretation of language for demotion/layoffs. The attorney

10

advised that total city seniority is the primary basis for reductions in force, demotion and recall.

It is the DFD's and the DFFA's opinion that human resources did neither of what was mentioned, but incorrectly applied a "3 year rule" to layoffs. This rule only applies to demotions. We hope to resolve this matter as quickly as possible.

(Union Def.'s Ex. 16).

On October 5, 2012, the Union sent each of the Plaintiffs the same letter. (Union Def.'s Ex. 36). Those letters from the Union stated:

On July 31, 2012, the DFFA grieved *all* layoffs and demotions of DFFA members (grievance #17-12) that had been forcasted by the City. As written, our grievance broadly captured *any* layoff and/or demotion that would violate the DFFA collective bargaining agreement As such, that July 31 grievance captured the individual grievances of anyone improperly laid-off or demoted on August 10, 2012.
So, if you grieved your layoff or demotion, it is included in our July 31 grievance. This is true even if you grieved after July 31. In other words, no grievance that challenges an individual's layoff or demotion has been rejected by the DFFA.
To that end, if you have any evidence to support the DFFA's reliance on "total city seniority" in cases of layoffs and demotions "attributable" to a reduction in force, please submit that to us as soon as possible.

(*Id*.) (emphasis in original). Thus, by October 5, 2012, the Union had changed its position and was arguing that city-seniority was required and that layoffs based on departmental-seniority violated the CBA. (*Id*.).

It is undisputed that each of the Plaintiffs were recalled to work as firefighters for the City on October 29, 2012. (First Am. Compl. at ¶¶ 32, 52, 72, 92, 112, 132, 152, 172, 192, 212, 232).

Thus, Plaintiffs' layoffs lasted a total of 80 days. (Pls.' Stmt. U at ¶ at 72).

The Union and the City ultimately settled Grievance #17-12, filed by the Union. (*See* Union Def.'s Ex. 40, "Settlement and Stipulated Award."). That Settlement and Stipulated

Award notes that the Union and the City had met, in order to negotiate a resolution of Grievance #17-12, during the months of November and December of 2012, and January of 2013. (*Id.* at Pg ID 2374). During those negotiations, the DFFA argued that Plaintiffs were among those members who "were improperly laid off on August 10, 2012, in that City-wide, augmented seniority was not used to determine the order of their layoff," and sought "make-whole relief" for them. (Pls.' Ex. 15, D.E. No. 69-15 at Pg ID 3387-88). The Settlement and Stipulated Award provides, in pertinent part:

> 1. IMPROPER LAYOFFS
>
> A.   The City agrees to pay the following individuals back pay, at their pay rate in effect when these individuals were laid-off, for the period August 10, 2012 up to and including October 29, 2012:
>
> | | |
> |---|---|
> | Perry Anderson | Samuel Shack |
> | David Rivera | Eric Peeples |
> | Arnold Freeman | Vincent Fields |
> | Lee Jones | Jamal Jennnings |
> | Ralph Glenn | Exander Poe |
> | Anthony McCloud | Joseph Easterling |
>
> . . . .
>
> 5. BACKPAY
>
> A.   The City agrees that all back pay owed under this Agreement, regardless of its nature, will be paid within one hundred and twenty (120) days from January 25, 2013.
>
> B.   The City further agrees that this backpay will include all items that would make the individuals whole, including but not limited to, overtime pay and medical costs/expenses incurred during their improper layoff.

(Union Def.'s Ex. 40 at Pg ID 2374 & 2377).

**EEOC Complaints**

Plaintiffs filed separate EEOC charges against the City and against the Union. Although

12

the City's motion raised failure to exhaust administrative remedies, Plaintiffs did not submit the

relevant documents concerning Plaintiffs' EEOC charges and right-to-sue letters as exhibits to

their response brief.  Nevertheless, the Court has gone through the voluminous exhibits filed by

Defendants, to locate the relevant documents.

**Plaintiffs File This Action**

In the First Amended Complaint, each of the Plaintiffs acknowledges that he "had some

of his back pay paid to him as part of the settlement of his grievance."  (*See, e.g.*,First Am.

Compl. at ¶ 33 ).  Each Plaintiff then asserts that he "has suffered damages in terms of loss of

compensation, entitling him to the recovery of back pay" but does not allege any actual amounts

of back pay that were not paid.  (*Id*. at ¶ 34).

## ANALYSIS

I.     **The City's Motion For Summary Judgment**

In its Motion for Summary Judgment, the City argues that it is entitled to summary

judgment, as to the claims of each of the Plaintiffs, on several grounds.

A.     **Can Each Named Plaintiff Show That He Is Entitled To Bring A Title VII Claim In This Action?**

The City's first argument is that all but one of the Plaintiffs are not entitled to bring the

Title VII claims in this action because they either did not file a timely EEOC charge or have not

received the requisite right-to-sue letter from the EEOC.  The City notes that the filing of a

timely EEOC is a prerequisite to filing a Title VII claim in federal court.  It also notes that there

is a narrow exception to that rule, called the single-filing rule.  The City argues that in this case,

only four Plaintiffs filed timely EEOC charges (Peeples, Anderson, McCloud, and Rivera).

Three of those four persons, however, did not receive right-to-sue letters from the EEOC.  Only

one of those four persons who timely filed charges (Rivera) received a right-to-sue letter. The City asserts that the single-filer exception should not be applied here, such that all the other Plaintiffs could tag on to his EEOC charge, because Rivera's claim is not sufficiently related to the claims of the others. The City notes that Rivera claimed he was discriminated against because he is Hispanic, while all of the other Plaintiffs are black. The City also asserts that other facts sufficiently distinguish Rivera's claim from the others, such as that Rivera was off on medical leave at the time of the layoff.[2] The City supported its arguments with citations to applicable case law and references to the evidence that supports its arguments.

In response, Plaintiffs essentially ignore this argument. Plaintiffs' entire "legal argument" as to the City's challenge consists of their re-stating the issue and then stating how Plaintiffs answer it:

1.  Does the "single-filer" rule under Title VII apply, so that each Plaintiff demonstrate [sic] that he is entitled to bring suit under Title VII?

Defendant City says No.
Plaintiffs Yes

(D.E. No. 68 at Pg ID 2996). That's it. Plaintiffs' response brief contains no other reference to, or analysis of, the City's legal challenge. And Plaintiffs' brief fails to provide the Court with any of the documents that would be necessary for the Court to analyze this challenge, such as the EEOC charges that Plaintiffs filed against the City and any right-to-sue letters that Plaintiffs received in connection with their EEOC charges against the City. The only references made in Plaintiffs' brief opposing the City's motion are: 1) a footnote stating that "Freeman did not file

---

[2]As to Rivera, Plaintiffs' Brief notes that he was injured at or near the layoff date and that he went on workers compensation.   (D.E. No. 68 at Pg ID 3015 n.4).

14

an EEOC charge."  (D.E. No. 68 at Pg ID 3008 n.3); and 2) an assertion that "When Plaintiff

filed EEOC charges, they complained that DFFA had not accepted their individual grievances,"

and a citation to documents found in the Union's exhibits, which are EEOC charges filed against

the City – not the City.[3]

Despite Plaintiffs' failure to respond to this argument or submit the relevant documents

needed to oppose the challenge, the Court has gone through the documents filed by the

Defendants, in order to determine when the various Plaintiffs filed their EEOC charges against

the City and whether any right-to-sue letters were issued as to the charges against the City.

Having done so, the Court concludes that the City's argument has merit and that the only

Plaintiff who may proceed with a Title VII claim against the City in this action is Rivera.

"Exhaustion of administrative requirements is a precondition to filing a Title VII suit."

*Lockett v. Potter*, 259 F. App'x 784, 785 (6th Cir. 2008).  A private plaintiff under Title VII must

satisfy two conditions before commencing suit in federal court: 1) he must file timely

administrative charges with the EEOC, within 300 days of the alleged discrimination; and 2) he

must then obtain a "right-to-sue" letter from the EEOC.  *McPherson v. New York City Dept. of*

*Educ.*, 457 F.3d 211, 213 (2d Cir. 2006); *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448,

---

[3]In Plaintiffs' responses to the City's Statement, Plaintiffs denied certain statements
relating to the EEOC charges against the City, and related right-to-sue letters, but then direct the
Court to documents that pertain to the EEOC charges against the Union – not the City.  For
example, Paragraph 28 of the City's Statement stated that "Plaintiffs Peeples, Anderson and
McCloud did not receive a Right to Sue Letter from the EEOC.  (Ex. 30 to Def. COD Br.)."
Plaintiffs' responded, "Deny. Under Rule 56, you must construe the facts in favor of the non-
moving party.  The City incorrectly states that Plaintiffs Peeples, Anderson and McCloud did not
receive a Right to Sue Letter from the EEOC. [DN 58-44, PageID 2415 (Anderson), 2417
(Peeples), 2418 (McCloud)]."  (Pls.' Stmt. C at ¶ 28).  But the cited right-to-sue letters identified
by Plaintiffs are letters issues as to the Plaintiffs' EEOC charges against the Union – not the
City.

456 (6th Cir. 1999); 42 U.S.C. § 2000e-5(e)(1).

The City is correct that the only Plaintiffs who filed timely EEOC charges against the City are Anderson, Peeples, McCloud, and Rivera.

The alleged discriminatory layoffs occurred on August 10, 2012. 300 days from August 10, 2012, is June 6, 2013. The documents reflect two rounds of EEOC charges filed against the City by Plaintiffs: 1) in May of 2013, Anderson, Peeples, McCloud, and Rivera filed EEOC charges against the City; and 2) in July of 2013, the remaining Plaintiffs, except Freeman who never filed one, filed EEOC charges against the City. The first group was timely, the second was not. Rivera's charge alleged discrimination on the basis of his national origin, Hispanic. The remaining Plaintiffs, who are black, alleged that they were discriminated against based upon their race.

As to the four Plaintiffs who filed timely EEOC charges against the City, three of those persons (Anderson, Peeples, and McCloud) did not receive the requisite right-to-sue letter from the EEOC

"Under Title VII, once an individual files a charge alleging unlawful employment practices, the EEOC must investigate the charge and determine whether there is 'reasonable cause' to believe that it is true." *EEOC v. Frank's Nursery and Crafts, Inc.*, 177 F.3d at 455. The EEOC issues what is known as a "right-to-sue letter" if: 1) it determines there is reasonable cause to believe that Title VII was violated, but the EEOC was unable to obtain voluntary compliance and has decided not to bring a civil action itself; or 2) if it concludes there was no violation. *Id.; see also* 29 C.F.R. § 1601.28. In addition, if the claimant has not received a reasonable cause determination from the EEOC within a certain amount of time, the claimant

16

may request a right-to-sue letter.  *Id.*

An "individual may not file suit under Title VII if she [or he] does not possess a 'right to sue' letter from the EEOC."  *EEOC v. Frank's Nursery and Crafts, Inc*., 177 F.3d at 456.

Here, after they filed their EEOC charges against the City, the EEOC closed out the charges against the City filed by Anderson, Peeples, and McCloud by issuing them each an "Acknowledgment of Settlement" that stated "[i]n view of the settlement agreement reached between the Respondent and the person claiming to be aggrieved, wherein Respondent agreed to pay all back pay owed to Charging Party, reinstate his seniority and reinstate him back to the position, the [EEOC] will take no further action on behalf of the person claiming to be aggrieved."  (D.E. No. 54-31 at Pg ID 1660, 1661, 1662).   There is no evidence in the record to indicate that those three claimants received a letter-to-sue from the EEOC relating to their EEOC charges against the City.  As such, Anderson, Peeples, and McCloud cannot assert a Title VII claim against the City in this action.

That leaves Rivera.  The City concedes that Rivera's EEOC claim against the City was timely filed.  Rivera's EEOC charge asserted that the City wrongfully laid him off "due to my national origin, Hispanic."  (D.E. No. 54-30 at Pg ID 1656).  In his EEOC charge, Rivera checked the box for "national origin" discrimination; he did not check the box for "race" discrimination and his narrative includes no reference to racial discrimination.  (*Id*.).   The City also concedes that Rivera received a right-to-sue letter from the EEOC in relation to his EEOC charge against the City.  (*See* D.E. No. 58-44, 6/11/13 right-to-sue letter).  As such, Rivera can proceed with his Title VII national origin discrimination claim against the City in this action.

In their brief opposing the City's Motion for Summary Judgment, Plaintiffs suggest that

17

they should all be permitted to proceed with their claims under the single-filer exception. But again, Plaintiffs' brief simply states:

> 1. Does the "single-filer" rule under Title VII apply, so that each Plaintiff demonstrate [sic] that he is entitled to bring suit under Title VII?
>
> > Defendant City says No.
> > Plaintiffs Yes

(D.E. No. 68 at Pg ID 2996). Thus, the remaining Plaintiffs wish to "piggyback" on Rivera's timely EEOC charge.

Given Plaintiffs' complete failure to develop or support that argument, particularly in light of the City's arguments as to why the exception should not be applied (ie., different kind of discrimination alleged, differing factual circumstances that surround Rivera's layoff and his medical issues, etc.), the Court concludes that the exception should not be applied here. As a result, the Court concludes that the only Plaintiff who may proceed with a Title VII claim against the City is Rivera.

###     B.     Assuming *Arguendo* That They Could All Assert Their Claims In This Action, Can Plaintiffs Survive Summary Judgment On Their Title VII Claim?

Plaintiffs First Amended Complaint alleges that the City subjected them to disparate treatment on account of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In its pending Motion for Summary Judgment, the City contends that it is entitled to summary judgment as to all claims.

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on his discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "The usual Title VII burden-shifting framework" applies to claims where a plaintiff

18

alleges that the employer acted adverse to him because of race. *Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 431 (6th Cir. 2012).

### 1. Direct Evidence

If Plaintiffs can establish direct evidence of discrimination, then they survive summary judgment and "need not go though the *McDonnell Douglas* burden-shifting analysis." *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004).

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Id.* at 548. That is, "direct evidence  is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir. 1999).   This Court has previously explained:

> Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.* For example, a facially discriminatory employment policy or a corporate decision maker's express statement to remove employees in the protected groups is direct evidence. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).
>
> Such evidence was found to exist in *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), where the university president allegedly said that "[w]e already have two black vice presidents. I can't bring in a black provost." Those comments were found to constitute direct evidence of discrimination because they required no inference to conclude that racial consideration motivated, at least in part, the employment decision at issue.
>
> Direct evidence of discrimination was also found to exist in *Diaz v. City of Inkster*, 2006 WL 2192929 (E.D.Mich. 2006), where the plaintiff alleged that he was discriminated against on the basis of race. In that case, the plaintiff offered testimony that the City Manager had said that there were some "members on the council that wanted a black chief" and "when [the current police chief] retires, you can bet the next chief is going to be black." *Id.* at *9. The court concluded that the comments of that decision-maker constituted direct evidence because they expressed that race was a determining factor in the employment decision at issue.

> This Court found direct evidence of age discrimination to exist in *Parker v. Charter Township of Redford*, 2007 WL 1675219 (E.D.Mich. 2007). In that case, the plaintiff presented evidence to establish that Mr. Handy was the decision-maker with respect to the plaintiff's termination. Plaintiff also submitted evidence to establish that Mr. Handy, during a break from the township meeting in which the plaintiff's position had been discussed, said that the plaintiff "is old, he's been here to[o] long, it's time for him to go, he needs to get out and make room for a younger man." This Court concluded that the comments, which were related to the employment decision at issue and made by the person who made the decision, would constitute direct evidence of age discrimination if believed by the jury.

*Bhama v. Mercy Mem. Hosp. Corp*., 2009 WL 2595543 (E.D. Mich. 2009).

Here, Plaintiffs contend that "there is direct evidence that the race of Plaintiffs – either black or Hispanic – played a role in their layoffs." (Pls.' Br. at 18). Plaintiffs assert that Roger Williams[4] "stated, in his capacity as an HR Specialist, that Plaintiffs were laid off in order to 'save the white boys' because 'DFFA did [not] want to lay those white boys off.'" (Pl.'s Br. at 18). But that portion of Plaintiffs' brief does not contain any citation to the evidence that establishes that Williams made those alleged statements.

In the facts section of their brief, Plaintiffs assert that "Williams told some Plaintiffs that they were chosen for layoffs to 'save the white boys' and that DFFA "didn't want to lay the white boys off.' [Exh. 30, Rivera Depo., p. 93; Exh. 26, McCloud Depo., p. 38]." (Pls.' Br. at 6; *see also* Pls.' Br. at 11; *see also* Pls.' Stmt. C at ¶ 14 & 16). In the cited portion of Rivera's deposition, Rivera testified as follows:

> Q.   Did you ever meet with the City?
> A.   No.

---

[4]In its Brief, the City of Detroit discusses whether or not alleged statements made by another person, Teresa Singleton (Sanderfer), could constitute direct evidence. (City's Br. at 30). But Plaintiffs' response brief only asserts that alleged comments by Williams constitute direct evidence. (Pls.' Br. at 17-19).

20

> Q.    Did you ever hear about Plaintiffs meeting with the City?
> A.    I did hear when Poe had met with Roger Williams and that Roger Williams had mentioned to him that we were getting laid off to save the white boys.
> Q.    Do you know if anyone was with Poe?
> A.    No, I don't.
> Q.    Any other meetings that you heard or did Poe tell you anything else that was said with Mr. Williams?
> A.    No.

(Pls.' Ex. 30, Rivera Dep. at 93).  In the cited portion of McCloud's deposition, McCloud testified as follows:

> Q.    Did Mr. Peeples tell you that Mr. Williams said anything about the layoffs being – that there was any racial discrimination that happened during the layoffs?
> A.    Mr. Poe told me that Roger Williams said to him that the DFFA didn't want to lay those white boys off.

(Pls.' Ex. 26, McCloud Dep. at 38).

It is well established that hearsay evidence may not be considered on summary judgment. *Jacklyn,* 176 F.3d at 927.

Plaintiffs' Counsel makes a cursory assertion that Williams played a role determining who would be laid off and, therefore, any statement made by Williams "is not hearsay and is admissible at summary judgment."  (Pls.' Br. at 18).  Although no explanation for that assertion is provided, Plaintiffs presumably assert that Williams's statement would be admissible as an admission of a party opponent.

But as the City notes in its Reply, the cited deposition testimony involves *multiple levels* of hearsay.  Neither Rivera nor McCloud testified that Williams made the alleged out of court statements in their presence.  Rather, they testified that Williams made the statements to Poe and then Poe later told them about the statement.  Moreover, based upon what Williams allegedly

21

said to McCloud, it appears that Williams could have been repeating what some unidentified person at the Union said to him, adding yet another layer.

The Court rejects Plaintiffs' assertion that direct evidence supports their discrimination claims because the only evidence that Plaintiffs direct the Court to constitute inadmissible hearsay.  In addition, even if the statements were admissible, they do not appear to be "direct evidence" (ie., that which requires no inferences) of a discriminatory motive on the part of the City in any event.

## 2.      Circumstantial Evidence

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  If the employer articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is in reality a pretext to mask discrimination.  *Skrjanc v. Great Lkakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).

### a.      Prima Facie Case, With Heightened RIF Standard

The parties agree that to establish a prima facie case of race discrimination, a plaintiff must generally show that: 1) he was a member of a protected class; 2) he suffered an adverse action; 3) he was qualified for the position; and 4) he was replaced by someone outside of the protected class or was treated differently than similarly-situated, non-protected employees.

The City asserts, and Plaintiffs do not dispute (*see* Pl.'s Br. at 20 & 23), that the fourth

element of the prima facie is heightened because this case involves a reduction in force.[5]

In order to prove the fourth prong in cases involving a workforce reduction, a plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff" for layoff or discharge for impermissible reasons. *Barnes v. GenCorp.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009); *Copeland*, 499 F. App'x at 431. The reason for this is because the most common legitimate reason for the layoff or discharge of a plaintiff in a reduction in force situation is the work force reduction. *Geiger*, 579 F.3d at 624. The guiding principle in a work-force-reduction case is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of race. *Geiger*, 579 F.3d at 624.

Here, the parties agree that Plaintiffs can establish the first three prongs of a prima facie race discrimination case (i.e, member of protected class, qualified for position of firefighter, and suffered an adverse action by virtue of being laid off for a period of 80 days). But the parties disagree as to whether Plaintiffs can produce sufficient "additional direct, circumstantial, or statistical evidence" in order to meet the fourth prong.

### 1. Direct Evidence

As explained above, the Court concludes that Plaintiffs have not come forth with any admissible direct evidence of discrimination. The only evidence identified by Plaintiffs as to the

---

[5]Moreover, even if Plaintiffs disputed that this case involves a reduction in force, Plaintiffs have failed to refute the record evidence submitted by the City that establishes that the layoffs at issue were done in connection with a reduction in force. *Copeland*, 499 F. App'x at 432.

comments allegedly made by Williams is inadmissible hearsay and it is not direct evidence in any event.

### 2. Statistical Evidence

"Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes*, 896 F.2d at 1466. In order to create such an inference, "the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Id.* Both the methodology and the explanatory power of the statistical evidence must be sufficient to permit an inference of discrimination. *Id.* (citations omitted). In *Barnes*, the Sixth Circuit "caution[ed] that statistics must show significant disparity and comment[ed] on what standard deviations and statistical analyses other courts and panels [have] found sufficient." *Copeland,* 499 F. A'ppx at 433.

Here, Plaintiffs have not presented any actual statistical evidence.

### 3. Other Circumstantial Evidence

The third and final way that a plaintiff can attempt to proffer sufficient additional evidence to meet the heightened fourth prong, is to offer other circumstantial evidence that could allow a factfinder to believe that the employer intentionally discriminated against the plaintiff due to race. In *Barnes*, the court explained that a plaintiff in an age discrimination case could make such a showing by presenting evidence to show that the plaintiff "possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff." *Barnes*, 896 F.2d at 1466. "Alternatively, a plaintiff could show that the employer made statements indicative of a discriminatory motive." *Id.* Again, the "guiding principle is that the evidence

must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated" against the plaintiff because of race. *Id.*

Here, Plaintiffs have not made arguments based on their qualifications. And again, they have not submitted any admissible evidence of the employer having made statements indicative of a discriminatory motive.

What Plaintiffs did do in their brief is try to present what appears to be a "quasi-statistical" argument that one could infer a discriminatory motive on the part of the City because the impact of the City's change in the way firefighters were selected for layoff had a disproportionate impact on blacks and/or Hispanics. That is, Plaintiffs argue that the City knew that to change the basis for determining layoff order (City versus departmental seniority) would "improperly disadvantage minority firefighters" and that disproportionate impact on minorities constitutes circumstantial evidence of race discrimination.

On July 30, 2012, the City constructed an initial matrix to show the intend RIF employment actions, including demotions, transfers, and layoffs. That matrix included 29 firefighters who were going to be laid off in the RIF. At that time, the City was using city-seniority to determine layoff order. The Court will call this the First List. Plaintiffs were not on that First List. But Plaintiffs have not provided the Court with evidence that shows the race or nationality of the persons that were on that First List. Plaintiffs direct the Court to the Union's Exhibit 11 (D.E. No. 58-11) but that document does not list race or nationality of the various employees listed.

Later, after the Union had argued that the layoffs should be based on departmental-seniority, the City changed the firefighters selected for layoff. On August 10, 2012, the City laid

25

off 27 firefighters. (Union's Exhibit 18). The Court will call this the Second List. Plaintiffs were among those 27 firefighters laid off. But the Union's Exhibit 18, the layoff notices sent, do not state the race or nationality of the persons laid off. So while the race/nationality of the 11 Plaintiffs is known, the Court does not know the race/nationality of the other 16 firefighters who were on this list.

Plaintiffs argue that the First List consisted mostly of white firefighters and that the Second List contained more minorities.

The main problem[6] with Plaintiffs' argument, however, is that Plaintiffs have failed to provide the Court with evidence to establish the race or nationalities of the firefighters on the two different lists who were selected for layoff. Without that, the Court cannot tell if the City changing the basis for determining layoff order had a disproportionate impact on blacks or Hispanics. And Plaintiffs have not even attempted to provide a statistical analysis to support their argument.

The Court therefore concludes that Plaintiffs have failed to meet their heightened burden of establishing a prima facie case of race discrimination in this workforce-reduction case.

### C.     The City's Motion Also Requests Sanctions

In the conclusion section of the City's motion, the City states that it "is requesting sanctions as it submitted a Rule 11 letter demanding that Plaintiff's dismiss their unsubstantiated claims." (D.E. No. 54 at Pg ID 1393). The City's motion did not include a determination of sanctions as one of the issues to be determined. (*Id.* at Pg ID 1354).

---

[6]Another problem is that the RIF also included demotions and transfers, not just layoffs, so the Court cannot look at impact of layoffs on minorities in isolation, without also looking at demotions and transfers made at the same time.

26

The Court denies the City's request for sanctions, for several reasons. The City made its request in the conclusion section of its brief. The Court also concludes that the City's letter (which is not a motion) fails to fully comply with the "safe harbor" provision of Fed. R. Civ. P. 11. Moreover, the Court would not be inclined to award sanctions under the circumstances presented here even if the City has fully complied with the safe harbor provisions.

## II.     The Union's Motion For Summary Judgment

The Union argues that it is entitled to summary judgment because: 1) Plaintiffs cannot establish that the Union breached its duty of fair representation; and 2) Plaintiffs cannot establish that they are entitled to any damages against the Union in any event.

### A.     Do Plaintiff's Title VII Claims Against The Union Fail Because The Union Discharged Its Duty Of Fair Representation?

The Union argues that under Sixth Circuit law, a plaintiff who sues a union under Title VII must establish that the union breached is duty of fair representation.

In *Wells*, as in this case, the plaintiff brought a Title VII discrimination claim against her union but did not bring a claim for breach of the duty of fair representation. *Wells v. Chrysler Group*, LLC, 559 F. A'ppx 512 (6th Circ. 2014). In affirming the district court's dismissal of her Title VII claim, the Sixth Circuit noted that Plaintiff argued "that she did not bring a claim for a breach of the duty of fair representation, but rather that her claims were for race and sex discrimination under Title VII." *Wells*, 559 F. App'x at 513. The Sixth Circuit found that argument "meritless," explaining:

> The duty of fair representation incorporates a requirement that the union not act discriminatorily. *See Emswiler v. CSX Transp., Inc.,* 691 F.3d 782, 793 (6th Cir. 2012). Additionally, Title VII makes it unlawful for a union to deny fair representation based upon race or sex. *See 42 U.S.C. § 2000e-2(c)(1); Goodman v. Lukens Steel Co.,* 482 U.S. 656, 668-69, 107 S.Ct. 2617, 96 L.Ed.2d 572

27

(1987). Indeed, district courts in this circuit—following the Seventh Circuit's test in *Bugg v. International Union of Allied Industrial Workers of America, Local 507 AFL-CIO*, 674 F.2d 595, 598 n.5 (7th Cir. 1982) –  have required Title VII plaintiffs to prove that a union breached its duty of fair representation. *Beshears v. Hennessey Indus., Inc*., No. 3:12-00087, 2012 WL 6093457, at *2 (N.D. Tenn. Dec. 7, 2012); *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 727 (N.D. Ohio 2008). Therefore, a claim that the duty of fair representation was breached on account of discrimination and a claim of discrimination in failing to fairly represent the employee are essentially the same. Other courts have recognized this commonality in similar cases. *See Agosto v. Corr. Officers Benevolent Ass'n*, 107 F. Supp.2d 294, 304 (S.D. N.Y. 2000) (collecting cases).

*Wells, supra*, at 514.

Thus, district courts within the Sixth Circuit have concluded that, under *Wells*, a plaintiff must establish a breach of the duty of fair representation in order to proceed with a Title VII discrimination claim against the union. *Swanson v. UAW Int'l Union*, 2015 WL 5168579 at * 4 (E.D. Mich. 2015, J. Cleland) (based on *Wells*, "it appears that a plaintiff" must establish a breach of fair duty of representation to establish a Title VII claim against union).

Without citation to any Sixth Circuit to support the assertion, and with no discussion of *Wells*, "Plaintiffs submit that there is no DFR analysis required for violations of Section 703(c)(3) of Title VII."  (Pls.' Br. at 18).

In *Wells*, the Sixth Circuit has expressed the view that a plaintiff must establish a breach of the duty of fair representation in order to proceed with a Title VII discrimination claim against his or her union.

Plaintiffs have made no attempt to show how they can establish that the Union breached its duty of fair representation under the facts presented in this case.

Within the Sixth Circuit, courts follow the Seventh Circuit's test in *Bugg* for evaluating such claims (*see Wells, supra*, at 514; *Swanson, supra* at *5), which requires the plaintiff to

28

establish: 1) that the employer committed a violation of the collective bargaining agreement with respect to the plaintiff; 2) that the union permitted that breach to go unrepaired, thus breaching its own duty of fair representation; and 3) that there was some indication that the union's actions were motivated by racial animus. *Bugg*, 673 F.2d at 598 n.5.

Again, Plaintiffs have made no attempt to explain how they believe they could make the requisite showing under the circumstances of this case. The Union's brief contains a cogent explanation of why Plaintiffs cannot establish that the Union breached its duty of fair representation under the circumstances presented here.

Simply stated, the Union initially took the position that the layoffs should be based on departmental seniority under the CBA. But after Plaintiffs objected, and after further discussion, the Union hired counsel to review the legal issue (i.e, whether the layoffs were to be made based on city-seniority or departmental-seniority). After engaging counsel and getting a legal opinion, the Union then sided with Plaintiffs' interpretation – that city-seniority was controlling. Moreover, Plaintiffs were reinstated and the Union *successfully grieved* Plaintiffs' layoffs, securing an award of make-whole backpay for Plaintiffs.[7] Thus, the Court fails to see how Plaintiffs could possibly satisfy the second element above – showing that the union permitted a breach of the collective bargaining agreement "to go unrepaired," thus breaching its duty of fair representation.

Accordingly, the Court concludes that the Union is entitled to summary judgment.

---

[7]Plaintiffs have not offered any evidence to show that they were not actually paid all the backpay they were awarded. In addition, even if that were not the case and the City failed to make the correct payment, the Union still secured the settlement agreement that entitles Plaintiffs to the make-whole backpay. Plaintiffs have not alleged that they ever asked the Union to pursue a breach of settlement claim.

**B.      Do Plaintiffs' Damages Claims Fail Because Plaintiffs Have Been Reinstated And Made Whole, and Because Certain Damages Are Unavailable?**

It is undisputed that Plaintiffs were reinstated (or in the case of Anderson, offered reinstatement).  Thus, Plaintiffs are not seeking reinstatement.  Rather, Plaintiffs' First Amended Complaint asks the Court to award them "back pay," "compensatory damages," and an award of "punitive damages" against the Union.  (First Am. Compl. at 25).  The body of the First Amended Complaint seeks damages for alleged emotional distress.  (*See e.g.*, First Am. Compl. at ¶ 35).

In its motion, the Union asserts, as an additional ground for entry of summary judgment in its favor, that Plaintiffs are seeking various types of damages to which they are not entitled as a matter of law.

First, the Union asserts that because Plaintiffs have already received "make-whole" backpay, they cannot obtain an award of backpay in this action. (Union's Br. at 22). (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir. 1988) as explaining that backpay is "presumptively favored as a make-whole remedy.").

Second, the Union's motion asserts that Plaintiffs' request for emotional distress damages also fails as matter of law, stating:

> Plaintiffs seek compensatory damages, i.e., damages for emotional distress.  (Ex. 1).  But, as a matter of law, Plaintiffs are not entitled to compensatory damages because the DFFA acted responsibly and in good faith.  Stated another way, the DFFA did not act with the requisite "extreme and outrageous" conduct necessary to recover emotional damages."  *Nitzsche v. Stein, Inc*. 797 F.Supp. 595, 599 (N.D. Ohio 1992) (damages for emotional distress can only be granted against a union for violating the DFR if the union's conduct was "extreme and outrageous.").

(Union's Br. at 22).

30

Third, the Union asserts that "[a]s a matter of law, Plaintiffs cannot recover punitive damages. *Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 754 (6th Cir. 1996), *citing IBEW v. Foust*, 442 U.S. 42, 52 (1979) (punitive damages are not available against a union for a DFR breach)." (Union's Br., D.E. No. 56 at Pg ID 1822).

Notably, in responding the Union's Motion for Summary Judgment, Plaintiffs ignored the Union's legal arguments regarding damages.

Buried in one of the facts sections of their brief, Plaintiffs asserted that the Union failed to provide a proper breakdown of the backpay calculations, directing the Court to Docket Entry No. 66. Plaintiffs asserted that they "cannot determine that all Plaintiffs received their full portion of backpay." (*Id.* at Pg ID 3326-27). Docket Number 66 was Plaintiff's Reply Brief, made in support of Plaintiff's Motion to Compel filed as Docket Entry No. 53.

But the remainder of Plaintiffs' brief ignores all of the Union's arguments concerning damages and fails to provide any proper basis for the Court to reject the Union's damages arguments. That is, Plaintiffs' statement of the issues (*see* Pls.' Br., D.E. 69 at Pg ID 3312-13), and the argument section of their brief (*Id.* at Pg ID 3327-3336) fail to recognize or address any of the Union's properly-supported challenges relating to damages.

If, at the time they responded to the Union's motion, Plaintiffs needed additional discovery from the Union before responding to the damages arguments, then Fed. R. Civ. P. 56(d) afforded Plaintiffs a recourse:

> **(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify it opposition, the court may:
>
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declaration or to take additional discovery;

31

or
(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Plaintiffs did not file such an affidavit or declaration, nor did they ask the Court for any such relief.  Rather, Plaintiffs simply filed their response, ignoring the Union's damages arguments.

In addition, in its Reply Brief, the Union stressed Plaintiffs' utter failure to address any of its damages arguments.

Despite Plaintiffs' failure to ask the Court to defer ruling on the motions until they were provided with the discovery they claimed had not been provided regarding backpay calculations, *this Court deferred ruling on the motions on its own*.

As of October 17, 2016, all of the discovery disputes were resolved, and that includes the Union having produced all of the requested information at issue in Plaintiff's Motion to Compel filed as Docket Entry No. 53) (*See* 10/16/16 Stipulated Order Resolving Remaining Discovery Motions and Objections, D.E. No. 89 at Pg ID 4176, "Plaintiffs' Motion to Compel Defendant DFFA to Produce [53] is mooted and resolved because Defendant DFFA has produced the requested information").  The parties were notified that this Court intended to hold the hearing on the pending summary judgment motions on January 26, 2107.  (*See* 10/12/16 Hearing Notice, D. E. No. 86).  That was *three months ago*.  Yet Plaintiffs' have not sought to file a supplemental brief responding to the damages arguments or asking the Court to consider any evidence that was not included at the time they filed their response.

The Court shall grant summary judgment in favor of the Union because Plaintiffs' have been reinstated and awarded make-whole backpay relief in connection with the Union-pursued grievance settlement, and the remaining damages are unrecoverable against the Union.

32

### C.      Should The Union Be Awarded Its Costs And Attorney Fees?

The Union's motion also asks the Court to award it is cost and attorney's fees,

presumably under Fed. R. Civ. P. 11, given that it directs the Court to the Union's Exhibit 51, a

letter to Plaintiffs' Counsel under Rule 11.

The Court declines to impose sanctions.   As a threshold matter, it does not appear that

the Union fully complied with Rule 11's "safe harbor" provision.[8]   Moreover, even if it had, the

Court would not impose sanctions under the facts and circumstances presented here.

As noted above, the Court concludes that the Union has the better argument as to the

Union's first issue presented in its motion.   That is, that under existing Sixth Circuit law,

Plaintiff has to show that the Union breached its duty of fair representation in order to prevail on

its claim and that is has not shown it can do so here.   While Plaintiffs did not discuss or try to

distinguish *Wells*, Plaintiffs did come forth with some limited argument as to why they do not

believe they should have to establish a breach of the duty of fair representation (ie., because the

statute does not contain that requirement.)  Thus, this Court does not conclude that Plaintiffs

were frivolous in their legal position such that sanctions should be imposed.

This Court also declines to impose sanctions on the ground that Plaintiffs' position on the

second issue was frivolous.  Although the Union told Plaintiffs' Counsel early on that their

position was that Plaintiffs had received all backpay they were due, Plaintiffs claimed that they

needed more information in order to determine whether they had actually received all backpay

they were entitled to under the grievance settlements.   Unfortunately, because of the delays

---

[8]By its terms, Rule 11's safe harbor provision requires that a "motion" for sanctions be
served on the opposing party at least 21 days before the motion is filed.  The Union directs the
Court to a letter that was sent to Plaintiff's counsel concerning Rule 11, not a motion.

33

caused by the way that the magistrate judge handled the discovery motions assigned to her, those discovery disputes were not resolved until after the summary judgment motions had been briefed.  This Court is not in a position to say that Plaintiffs lacked a good faith belief that they had not been paid all that was owed to them when they filed this action or when they responded to the pending motion.

CONCLUSION & ORDER

IT IS ORDERED that the City's Motion for Summary Judgment is GRANTED to the extent that the Court grants summary judgment in favor of the City as to Plaintiffs' claims.  The motion is DENIED to the extent that the Court denies the City's request for sanctions.

IT IS FURTHER ORDERED that the Union's Motion for Summary Judgment is GRANTED to the extent that the Court grants summary judgment in favor of the Union as to Plaintiffs' claims.  The motion is DENIED to the extent that the Court denies the Union's request for sanctions.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  January 26, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 26, 2017, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager